## Case No. 4,130.

### DUNBAR v. MILLER et al.

[1 Brock. 85.] [1]

Circuit Court, D. Virginia.　May Term, 1805.

FACTORS—DISCRETION OF CONSIGNEE IN DISPOSING OF GOODS—DUTY OF CONSIGNOR—OPENING SETTLED ACCOUNT.

1. P. H., residing in Richmond, Virginia, of the firm of M., H. & Co., London merchants, wrote to R. D., on the 5th of September, 1793, a merchant of Falmouth, Virginia, informing him of the arrival in James river, of the ship Molly, chartered by M., H. & Co., to load with tobacco to be shipped to Europe, consigned to M., H. & Co., and advising R. D. to embrace this favourable time and opportunity, as he deemed it, of shipping tobacco to Europe. The vessel, he said, would "go to Cork for orders, and from thence to any port in Europe, out of the straits." In another part of his letter, he informed R. D., that "if peace is not established in France, by the time the Molly arrives at Cork, it is most probable she will be sent to Rotterdam, or some port in Holland." On the 19th of the same month, R. D. wrote in reply, after informing P. H. that he had sent 58 hogsheads to be shipped by the Molly,—"I hope the tobacco will go to a saving market, as the quality is well suited to the Dutch market, where I expect it will ultimately go, as appearances, I conceive, strongly indicate a continuance of the war." The Molly arrived at Cork, about the end of the year 1793, when M.. H. & Co. determined to send the tobacco to France, the war still continuing, and accordingly consigned it to a mercantile house in Havre. After experiencing great delay and difficulty in obtaining the account of sales from the consignees in Havre, and using every effort to get from them the proceeds of sale, M., H. & Co. finally, in 1803, consented to a compromise, whereby R. D. was only entitled to £142 4s., after deducting costs, commissions, &c., for his proportion of the proceeds of the cargo of the Molly. It seems, that although it was clearly the understanding of R. D., that his tobacco would not be sent to France, should the war continue; yet his letter did not amount to a positive instruction, which would deprive the consignees, after the arrival of the tobacco in Cork, of the discretion of sending it to France, if they should deem it advisable for the interests of the consignor to do so. At all events, if the consignor objected to this destination being given to his tobacco, it was his duty to have informed the consignees of it, and his silence, after he was apprised of its destination, was an implied sanction and approval of the act of the consignees of which he had no right to complain, after the speculation proved to be disastrous. It seems, however, that only half commissions are chargeable by the consignees in such cases.

2. Where extensive and complicated dealings have been carried on between merchants, which have been closed by a settlement of their accounts, and a note has been given by one of them for the amount appearing due on such settlement, a court of chancery may open such settlement for the purpose of correcting any errors which the parties may have committed. But see Brydie's Executor v. Miller, Hart & Co. [Case No. 2,071].

This was a motion to dissolve an injunction obtained by the plaintiff, to restrain the defendants, Miller, Hart & Co., from issuing an execution on a judgment rendered on the law side of this court in their favour, against the plaintiff here.

Robert Dunbar, a merchant living in Fal-

mouth, Virginia, having for a series of years had extensive dealings with Miller, Hart & Co., London merchants, on a settlement of their accounts, on the 28th of June, 1796, executed his note to them for the amount appearing due on such settlement, which was as follows:

"Falmouth, 28th June, 1796. Eighteen months after date, I promise to pay to the order of Messrs. Miller, Hart & Co. of London, $8273, for value received, with interest from the date. Robert Dunbar.

"N. B. 58 hogsheads tobacco, weighing 66,503 lbs., shipped Miller, Hart & Co., in Sept. '93, per the Molly, Capt. Sanford, for which sales are not received, to be accounted for, and to be deducted from the above note when received account of sales appear."

At the November term of this court, 1800, Miller, Hart & Co. obtained a judgment against Robert Dunbar, for the amount of the above recited note, to be discharged by the payment of $7668 75, with interest from the 8th of August, 1798. The reduction of the amount of this note, was effected exclusively by payments made by Robert Dunbar, to Miller, Hart & Co., subsequent to its date, and no credit was allowed on the judgment for the price of the 58 hogsheads of tobacco referred to in the memorandum annexed to Dunbar's note, the account of sales not having been received at that time. The history of the transaction touching this tobacco, is as follows:

On the 5th day of September, 1793, Patrick Hart, of the firm of Miller, Hart & Co., living in Richmond, Virginia, addressed the following letter to Robert Dunbar, at Falmouth, Virginia:

"Dear Sir, I wrote you last post, since which I have advice of the arrival of the Molly, Capt. Sanford, an American bottom, chartered by Miller, Hart & Co., to load tobacco from their friends, at nine guineas per ton two shillings and three pence port charges. She loads at City Point, goes to Cork for orders, and from thence to any one port of Europe, out of the straits. You may have what room in her you want, shipped to their address on these terms, which is above five shillings per hogshead lower than any has been chartered at this way. As I think you will have no chance to sell, till the war is over, it is surely your interest to ship while the weather is good, and a chance of its getting to market in proper time. If peace is not established in France, by the time the Molly arrives at Cork, it is most probable she will be sent to Rotterdam, or some port in Holland; but to give her a chance of going there, she must be loaded in all this month, which I intend at all events to do, as I can get plenty of freight this way. Should we not have enough of our own to fill her I expect you will immediately ship the 60 hogsheads you mention. You may look out a craft and get them on board. My letters from Miller, Hart & Co. do not say, whether the ship loads at

[1] [Reported by John W. Brockenbrough, Esq.]

City ·Point, or Norfolk; but suppose the former. I will advise you by next post, which will be as soon as you can have the tobacco in the craft. I will keep room for you for 100 hogsheads, as I think it your interest to ship it, but you will say by Monday's mail, whether or not you will ship it."

On the 19th of the same month, Robert Dunbar wrote in reply to the above letter: "This hands you two receipts and invoice of 58 hogsheads of tobacco, shipped to the address of Miller, Hart & Co., which I hope will go to a saving market as the quality is well suited to the Dutch market, where I expect it will ultimately go, as appearances, I conceive, strongly indicate a continuance of the war."

The Molly, having taken in her cargo, sailed for Cork, where she arrived about the latter part of 1793. Miller, Hart & Co., on the arrival of the ship in Europe, determined, on consultation, to send the tobacco to Havre in France, while the war yet continued, and accordingly consigned it to the house of Jean Baptiste Teray & Co., of that place. The speculation proved to be a very unfortunate one. The account of sales rendered by Miller, Hart & Co., of Dunbar's tobacco, which was dated 31st January, 1803, after deducting therefrom the freight, commissions, and other charges, left a balance in favour of Robert Dunbar of £142 4s. The deposition of James Colquhoun, of the firm of James and Robert Colquhoun, of London, stated, that his firm were consignees of 250 hogsheads of tobacco, part of the cargo of the ship Molly, shipped in Virginia, by R. and W. Colquhoun of Petersburg, about October, 1793, with which she arrived at Cork in the month of December of the same year for orders, and that the advices from France were so encouraging at that time, as to induce the house of J. & R. Colquhoun to agree with Miller, Hart & Co. to send the ship Molly and cargo to Havre, as being, from every appearance at that time, the best market for tobacco in Europe; that he was privy to the correspondence of Miller, Hart & Co. with J. B. Teray & Co. of Havre, to whom the said cargo was consigned, and consented to the same, and was fully satisfied that every thing was done by Miller, Hart & Co. which was possible to get the best price and speedy remittance; that after long delay and much correspondence, he consented to compromise on behalf of his firm with Teray & Co. in the latter end of 1802, and to take for the cargo of the Molly, of 627 hogsheads of tobacco, the sum of 130,000 livres, of which his house received of Teray & Co. 51,502 livres, being their proportion agreeably to the invoice weight of their 250 hogsheads of tobacco.

The difference of exchange on payments made by Dunbar to Miller, Hart & Co. in favour of the former previous to their judgment against him, was shown to be $382 83, for which Dunbar was not allowed a credit. The commissioner also reported a balance in favour of Dunbar of £286 17s. 4d. resulting from errors and miscalculations of interest when the settlement took place between the parties. The plaintiff prayed to be allowed a credit on the judgment against him. 1. For £717 8s. 7d., the invoice price of his tobacco with interest. 2. For the difference of exchange on payments made before judgment. 3. For the balance appearing in his favour in the commissioner's report.

MARSHALL, Circuit Justice. The principal question in this case is: What is the complainant entitled to for the tobacco consigned by him to Miller, Hart & Co. in Sept., 1793? In discussing this question he has made two points. 1st. That in shipping the tobacco to France his orders were violated; in consequence of which, the consignees are responsible for its value. 2d. That the account of sales they now render ought not to bind him.

The nature of the trade between the consignor and consignee of tobacco, requires that a great degree of confidence should be placed by the former in the intelligence and integrity of the latter. He is frequently empowered to choose the market in which the commodity is to be disposed of. This arises from the circumstance that his situation enables him to decide on the interests of the consignor with better information than the consignor can decide for himself. A great latitude is therefore allowed for the exercise of his judgment, but it must be exercised within the limits prescribed by the consignor, or, where he is silent, within those prescribed by custom. In the case at bar, the limits prescribed by the consignor are to be looked for in the two letters of the 5th and 19th of September. The letter of the 5th contains the proposition of the consignee. He offers to receive consignments to Miller, Hart & Co. in the Molly. This vessel, he says, "goes to Cork for orders, and from thence to any one port of Europe out of the straits." This is a plain intelligible proposition, which authorized the consignee to order the vessel to France or elsewhere in Europe, provided it was not into the Mediterranean. It is observable, that Mr. Hart then proceeds to state the advantage which Mr. Dunbar might derive from accepting it before he advances any opinion respecting the probable particular destination of the vessel. This is a circumstance which may not be entirely immaterial. It may serve to show that in the opinion of the writer, the principal proposition was stated. After recommending a shipment in the vessel, whose orders were to be received at Cork, and whose destination from thence was to depend on the discretion of the partners in Europe, Mr. Hart proceeds to say something respecting the manner in which the discretion would probably be exercised. "If," says he, "peace is not established in France, by the time the Molly arrives at Cork, it is most probable she will be sent to Rotterdam or some port of Holland." It is

contended, on one side, that this amounts to a declaration that the tobacco would not be sent to France if the war should continue. On the other side, that this is merely a conjecture respecting the manner in which the discretion of the consignee would be exercised without forming a limitation of that discretion. With the proposition, is to be taken into view the declaration of the sense in which it was accepted. For this purpose, the court is referred to the letter of the 19th of September. This was after the tobacco had been put on board the craft; but, as no intermediate letter is produced on either side, it is presumed that none passed which would affect the case. In the letter of the 19th of September, Mr. Dunbar says, "I hope the tobacco will get to a saving market, as the quality is well suited to the Dutch, where I expect it will ultimately go, as appearances, I conceive, strongly indicate a continuance of the war." That both parties believed the Molly would not be ordered to France, should the war continue, is apparent; but whether either of them designed to prohibit Miller, Hart & Co. from giving such orders, if in their judgment it should be for the benefit of the cargo to give them, is not so clear.

Throwing the two letters into the form of an agreement, and construing that agreement literally, the express power given to order the Molly to any port in Europe, out of the straits, would not be restricted by any express declaration, that the right to send her to France depended on the restoration of peace. But there is great weight in the argument, that in mercantile transactions of this sort, the impressions made by the communications between the parties, ought to be considered, and if a meaning is fairly and justly to be implied, which the words themselves, if digested into a formal agreement, would not completely bear, that meaning ought not to be entirely disregarded by the court. Although the letter written by Mr. Hart reserves to his partners the power of ordering the Molly to any port in Europe, and does not positively restrict their exercise of this power, with regard to France, to the contingency of peace, yet its terms are such as clearly to convey the opinion, that the tobacco would not be sent to France, but on that contingency. "If," says he, "peace is not established in France by the time the Molly arrives at Cork, it is most probable she will be sent to Rotterdam, or some port in Holland." This reference, with respect to France, to the single contingency of peace, unconnected with the state of the market, shows, that in the mind of the writer, her being ordered to France would depend on that contingency only. It might, certainly, be fairly so understood by Mr. Dunbar. In strict prudence, the complainant ought to have observed the equivocal expressions of the proposition, and ought to have objected to the sending of his tobacco to France, un-

less peace should be re-established; but if he understood that the general power was reserved solely for the purpose of being exercised in its extent in the event of peace—and he might so understand the letter—he may be excused for not directing that which Miller, Hart & Co. had declared themselves previously to have resolved on.

It is believed, that no person can read that letter without a conviction, that at the time of writing it, Mr. Hart considered it as perfectly certain, that the Molly would not be ordered to France if the war should continue. The letter would not be a fair one, if such had not been his opinion. That Mr. Dunbar did believe the possibility of the power he gave, being so exercised, as to occasion the tobacco to be shipped to a port in France, depended on peace, is strongly to be inferred from his letter of the 19th of September. The whole context of that letter shows it. These communications, then, are to be viewed as an agreement by which the tobacco is consigned to Miller, Hart & Co., with a general power to ship it from Cork, to any port of Europe, out of the straits. But the application for that general power is accompanied with a representation of the manner in which it is to be exercised, which might well be understood, and which most probably was understood, as a declaration, that the vessel would only be sent to France on the contingency of peace. Whether this representation is so strong as to charge the consignee with the loss occasioned by sending the vessel to Havre, pending the war, is a point not absolutely decided by the court, because there is another part of the case which renders its decision unnecessary.

The agreement under which the tobacco was shipped, might be understood, in the one way or the other. If, in the opinion of Mr. Dunbar, the consignees had transcended their powers, and he did not mean to abide by their conduct, it is perfectly clear, that on mercantile principles, he should, on notice of what they had done, have declared to them, that the responsibility of their conduct rested on themselves; that the tobacco was theirs: and that he claimed a credit for its reasonable value, at those ports to which, in conformity with the contract, they might have shipped it. He was certainly not at liberty to reserve to himself the power of taking or rejecting the sales at Havre, at his discretion; but his silence on the subject, if not an approbation of their conduct, is an acquiescence under it. It has been contended, that this transaction was not communicated to Mr. Dunbar; but the fact will not support his counsel in this respect. His bill admits a knowledge of it when his note was given. Had the pressure of Mr. Dunbar's circumstances been such as to leave him not a free agent in this respect, the court would not have considered his silence as a waiver of his right to object to the shipment of his tobacco to Havre. But this is not pretended. His silence, therefore, can

only be attributed to one of two motives: either he chose to take the chance of a favourable account of sales, or, which is more probable, he expected that the loss would not be considerable, and preferred a submission to it, to a rupture with his friends and creditors. Let this be his motive, and it will not support him in the attempt now made. If then, silence had been observed on the part of Mr. Dunbar, he would have been precluded from objecting to the act of sending the Molly to Havre. But he has not been silent. The memorandum at the foot of his note, is a complete relinquishment of all objection to that transaction, so far as a relinquishment can be implied. This memorandum is said to have been made for his advantage, and this is true. But what was the advantage he expected to derive from it? Clearly only this. It proves, that from the note was to be deducted the tobacco, when the account of sales should be received. Why refer to the account of sales, if he did not mean to admit that he was to be bound by them? Why not claim an immediate, in stead of a future, credit, if the invoice price, or any other known standard, ascertained the credit to which he was entitled?

The subsequent correspondence on which the defendants rely, is certainly equivocal in its expression. But when the fact, that Mr. Dunbar had full knowledge of the Molly having been ordered to France, is ascertained, that correspondence ceases to be equivocal. It relates exclusively to the circumstance, that the sum for which Mr. Dunbar ought to be credited on account of this tobacco, is uncertain. The court, then, is perfectly satisfied that the orders given the Molly to sail for Havre, are sanctioned by the subsequent conduct of Mr. Dunbar, after having full notice of the fact. To the account of sales which has been returned, the objections are to the commissions and to the compromise With respect to the commissions, the court has required information respecting the custom, and has stated an opinion, that only half commissions is chargeable in such cases. If there be no custom, the court will direct that only half commissions be allowed in this case. With respect to the compromise, the circumstances under which it was made, and the deposition of Mr. Colquhoun, satisfy the court, that it was prudent to compromise the claim. The power of the consignees probably extended to a compromise, unless it was the will of the

consignor to take the transaction into his own hands. The court perceives no such disposition in him. Yet, under the circumstances of this case, it is the opinion of the court, that Miller, Hart & Co., ought to explain to the plaintiff, the terms and principles of the compromise. There is so little probability that the transaction has been unfair, that the court will not continue the injunction on that account, but will retain the suit on the docket if it be requested.

2. The accounts between the parties constitute the next subject of consideration. The court is of opinion, that any errors which may have existed in dealings carried on under the circumstances in which these parties were placed, ought to be corrected. It does not appear clearly, that a formal and complete settlement has ever taken place. The accounts were conducted under so many different forms, as to contribute something to the opinion that they have never been completely adjusted, and the early application of Mr. Dunbar on the subject, weakens the argument drawn from the time which has elapsed since accounts have been rendered. With respect to the credit claimed for difference in exchange, the arguments of the defendants themselves, if rightly understood, are in favour of it to a certain extent. The payments made before the judgment, ought certainly to be credited, according to agreement, at the current rate of exchange. The balance for which judgment was rendered, ought not to be affected by the exchange.

DECREE. The injunction was perpetuated as to the net amount appearing due by the account of sales rendered, adding thereto half commissions. 2. As to the difference of exchange on payments made by Dunbar to Miller, Hart & Co., before judgment; and 3. As to the amount appearing on the commissioner's report in favour of Dunbar, growing out of erroneous calculations of interest, and was dissolved as to the residue.

NOTE. See a summary of the decisions of the courts of the United States, respecting the relation between principal and agent, and consignor and consignee: 1 Pet. Cond. R. 594; 2 Pet. Cond. R. 533; and 3 Pet. Cond. R. 351, in notes [Manella v. Barry, 3 Cranch (7 U. S.) 415; Lee v. Munroe, 7 Cranch (11 U. S.) 366; The Frances, 9 Cranch (13 U. S.) 183].

DUNBAR (MYERS v.). See Case No. 9,990.

END OF CASES IN BOOK 7.